1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   In Re: John E. Cork,                )      No. CV-15-1869-PHX-SMM
                                         )
10              Debtor.                  )      BK No.      2:11-bk-33110-DPC
                                         )
11  John E. Cork,                        )      Adv. No.    2:12-ap-1675-DPC
                                         )
12              Appellant,               )
                                         )      **MEMORANDUM OF DECISION**
13  vs.                                  )          **AND ORDER**
                                         )
14  Gun Bo, LLC,                         )
                                         )
15              Appellee.                )
                                         )
16

17          Debtor John Cork ("Cork") filed a voluntary Chapter 11 bankruptcy petition in the

18  Bankruptcy Court, which was later converted to a Chapter 7 liquidation petition.

19  Subsequently, Plaintiff Gun Bo, LLC ("Gun Bo") initiated a § 727 adversary complaint

20  against Cork seeking to deny Cork a denial of discharge of his debts. (Case No. 2:12-ap-

21  1675-DPC.) Ultimately, the Bankruptcy Judge conducted a two-day bench trial on the § 727

22  adversary complaint, followed by final briefs, and then closing arguments. In a thorough 47-

23  page Order, the Bankruptcy Judge found for Gun Bo, and denied Cork a discharge of his

24  debts. Cork appeals from the Bankruptcy Judge's judgment denying him discharge pursuant

25  to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), and 727(a)(4)(A). (Doc. 1.)

26          This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). The Bankruptcy Code

27  allows a debtor to get a fresh start by discharging the debtor's pre-petition debts. But that

28  fresh start comes with a condition: the debtor must play by the rules. If the debtor does not,

1   then the Bankruptcy Code provides that the debtor will be denied the discharge of his debts.

2   Here, the Bankruptcy Judge found that Cork hid assets and lied under oath in his bankruptcy

3   filings and in proceedings on material issues. The evidence supports the findings and

4   conclusions of the Bankruptcy Judge; therefore, this Court will affirm the Bankruptcy

5   Court's final judgment denying Cork's discharge.

6                                    **BACKGROUND**[1]

7           Since the late 1990's, Debtor Cork, through his various development and management

8   companies, was involved in numerous land development projects as a land banker. (Doc. 9

9   at 6.) As a land banker, Cork had partnered with over 50 investors in various projects

10  representing more than $50 million of subordinated loans. (ER 4.) Cork facilitated the

11  development of real estate by working with builders and putting together the financing for

12  development projects. (ER 216-17.) Typically, a builder would provide a deposit of generally

13  around 20%, and the land banker would secure the rest of the financing to purchase the

14  desired land, which consisted of some portion of institutional financing, generally anywhere

15  from 50-65%. (ER 219.) The rest of the funds to purchase the undeveloped property would

16  generally come from loans from private investors which would be subordinate to institutional

17  financing. (ER 219-20.)

18          In 2007, Cork agreed to provide land banking services to develop over 200 lots in

19  Maricopa County on a project designated as Rancho Cabrillo. (ER 224.) At first, the

20  institutional lender, JP Morgan Chase ("Chase"), financed 70% of the project. (ER 224-25.)

21  Later, Chase indicated that it wanted its loan paid down to roughly 50%. (Id.) Cork obliged

22  and sought investors to loan the money necessary to pay down the Chase loan. (Id.) Mr. Park,

23  an individual with whom Cork had developed a business relationship, agreed to invest in the

24  project through a separate entity called Gun Bo LLC. (Id.) Gun Bo loaned $5.6 million to

25  Cork to pay down Chase's loan on the project and take a second mortgage on the property.

26  _____

27          [1]In its appellate review, the Court will focus on the necessary background facts. The
    Bankruptcy Court set forth a more exhaustive treatment of the background facts. (See ER
28  1-25.)

(ER 310.) Cork signed a personal guaranty for the Gun Bo loan. (Id.)

In 2008, when the real estate market collapsed, Cork faced massive defaults, the prospect of litigation, and serious tax consequences. (Doc. 9 at 6.) Many of the builders with which Cork was doing business defaulted on their land banking agreements, leaving Cork with bank debt that he had personally guaranteed for land loans all over the United States. (ER 5.) The Bankruptcy Judge found that Cork "was more than $250 million underwater." (Id.)

As a result, Cork and his advisors developed an out-of-court, global restructuring concept to salvage the development projects and preserve the investments of various creditors and investors. (Doc. 9 at 6.) Under the Plan, Cork would try to preserve those development projects which could be purchased at the depressed market value using new money from investors, *which would be given a higher priority than the loans they had previously made*. (Id. at 11.) Almost all of the investors agreed to sign onto the plan developed by Cork and his advisors. (Id.) Gun Bo chose not to agree to the plan and instead pursued litigation against Cork in state court. (Id. at 12.)

In July 2009, Gun Bo obtained a $7,047,599.30 judgment against Cork, plus post-judgment interest at the rate of 20%. (Id. at 8; ER 6, 283.) Gun Bo then began proceedings to satisfy its judgment, in which it was partially successful in reaching Cork's assets. (ER 16.)

In September of 2010, Cork formed Tiburon Management Company, Inc. ("Tiburon") because he "wanted an entity that – that [he] could use away from litigation, and [he] wanted to continue to manage the assets that [he] had free of any lawsuits." (SER 129-30.) Tiburon was formed as an Arizona limited liability company. (ER 7.) Tiburon was owned by Cork's children, Emilie and Nathan Cork; Cork had no ownership interest in the entity. (Id.)

In November of 2010, Searchlight Fund, LLC ("Searchlight") was created as a Nevada limited liability company. (Id.) Searchlight had an account at Charles Schwab ("Schwab Account"). (Id.) Emilie and Nathan were the authorized signatories on the Schwab Account. (Id.) Searchlight also had an account at IBC Bank ("IBC Account"). (Id.) Cork had

more than a decade-long banking relationship with IBC. (Id.) Emilie and Nathan were the authorized signatories on the IBC Account. (Id.) As of December 1, 2010, the Schwab Account balance was $0.00. (Id.) Between December 3 and December 9, 2010, Cork deposited $2,261,551 in personal tax income refunds into the Schwab Account. (ER 7-8; SER 119-20.) There were no loan documents and Searchlight did not maintain any account payment ledgers or tax records showing interest earned or paid. (ER 29; SER 135.) About 1 million dollars of Searchlight Funds were transferred to Tiburon in the year prior to Cork's bankruptcy petition and post-petition. (ER 10, 13, 318-19.)

Cork's children, Emilie and Nathan, testified by deposition at the Bench Trial. The Bankruptcy Judge found that Cork's children, who owned Searchlight and Tiburon, had very little involvement in managing Searchlight and Tiburon. (ER 14-15.) They went to the offices and signed checks and papers that they were directed to sign. (Id.) Emilie had no knowledge of Searchlight's principal assets, namely funds in the Schwab and IBC Accounts. (Id.) Similarly, Nathan testified that he did not know of or perform any management duties beyond

signing the checks which he was directed to sign. (Id.) He knew nothing about the financial condition of Tiburon or Searchlight. (Id.) In the depositions taken of Searchlight and Tiburon, Cork appeared at the Rule 30(b)(6) depositions as the person most knowledgeable. (ER 9.)

On December 2, 2011, Cork filed his voluntary Chapter 11 Petition with the District of Arizona Bankruptcy Court. (ER 6-7.) Cork's bankruptcy schedules listed $500,000 of the Searchlight Funds as a liquidated debt owed by Searchlight to Cork. (ER 8.)[2] On June 20, 2012, Cork's bankruptcy was converted from Chapter 11 to Chapter 7. On September 24, 2012, Gun Bo commenced the 11 U.S.C. § 727 adversary proceeding against Cork. (ER 4,

---

[2]On December 23, 2011, Cork filed an adversary proceeding, a preference adversary proceeding against Gun Bo, seeking to recover from Gun Bo allegedly preferential transfers said to total at least $1,661,380.50. (Case No. 2:11-ap-2352.) Ultimately, the Bankruptcy Judge granted Gun Bo's motion for summary judgment, dismissing Cork's adversary preference proceeding with prejudice. (ER 5.)

1 Case No. 2:12-ap-1675-DPC.)

2 On June 28, 2013, the Chapter 7 Trustee filed an adversary proceeding against Cork.

3 (Case No. 2:13-ap-761-DPC.)[3] Regarding the Trustee's adversary proceeding against Cork,

4 on August 19, 2014, Cork entered into a settlement with the Trustee. (ER 10.) The

5 Bankruptcy Judge approved the settlement between Cork and the Trustee on October 14,

6 2014. (Id.)

7 **STANDARD OF REVIEW**

8 The Bankruptcy Courts are statutorily organized pursuant to 28 U.S.C. §§ 151 et seq.

9 Under 28 U.S.C. § 158(a)(1), "[t]he district courts of the United States shall have jurisdiction

10 to hear appeals from final judgments, orders and decrees." In its appellate capacity, this Court

11 reviews the Bankruptcy Court's factual findings for clear error and legal conclusions *de*

12 *novo*. Wegner v. Murphy (In re Wegner), 839 F.2d 533, 536 (9th Cir. 1988). A mixed

13 question of law and fact occurs when the historical facts are established, the rule of law is

14 undisputed, and the issue is whether the facts satisfy the legal rule. Bammer v. Murray (In

15 re Bammer), 131 F.3d 788, 792 (9th Cir. 1997).

16 First, the Court establishes "the basic, primary, or historical facts, facts in the sense

17 of a recital of external events and the credibility of their narrators." United States v.

18 McConney, 728 F.2d 1195, 1200 (9th Cir. 1984) (en banc). Under the clearly erroneous

19 standard, the Court accepts the Bankruptcy Court's findings of fact unless the Court based

20 on its review of the "entire evidence is left with the definite and firm conviction that a

21 mistake has been committed" by the bankruptcy judge. Anderson v. Bessemer City, 470 U.S.

22 564, 573 (1985). Due regard is given to the opportunity of the Bankruptcy Court to judge the

23 credibility of the witnesses. See McConney, 728 F.2d at 1201. Thus, this Court does not

24 conduct "a full-scale independent review and evaluation of the evidence." Id.; see also

25 Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985) (stating that when factual

26

27 _____

28 [3]The adversary proceeding sought avoidance of transfers, turnover of estate assets, surcharge of exemptions, and other theories of recovery.

findings are based on determinations regarding the credibility of witnesses, the reviewing court gives great deference to the trial court's findings because the trial court had the opportunity to note variations in demeanor and tone of voice that bear so heavily on the court's understanding of and belief in what is said).

The second step is the selection of the applicable rule of law. See McConney, 728 F.2d at 1200. Questions of law are reviewed under the non-deferential *de novo* standard. Id. at 1201.

The third step is the application of law to fact, that is "whether the rule of law as applied to the established facts is or is not violated." Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19 (1982). The McConney court further discussed the standard of review for mixed questions of law and fact, as follows:

> If application of the rule of law to the facts requires an inquiry that is essentially factual, one that is founded on the application of the fact-finding tribunal's experience with the mainsprings of human conduct, the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed *de novo*.

McConney, 728 F.2d at 1202 (further citation and quotation omitted).

In this case, the Appellee (Gun Bo) is the party objecting to the discharge of a debtor, and it "bears the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007) (resolving standard of proof for claims made under 11 U.S.C. § 727, aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's statement of applicable law). Section 727's denial of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge. See Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996).

///

///

**DISCUSSION**

*Denial of Discharge under § 727(a)(2).*

Cork first contends that the Bankruptcy Judge erred in denying him discharge under § 727(a)(2) because Gun Bo did not meet its burden of proving subjective intent for Cork's transfer of assets that allegedly hindered, delayed, or defrauded a creditor. (Doc. 9 at 15-22.) According to Cork, it was error because the Bankruptcy Judge relied on constructive intent rather than actual or subjective intent. (Id.) Cork acknowledges that money transfers were made to Searchlight pre-petition but contends that he never intended to hinder, delay, or defraud Gun Bo; rather, the transfers were focused on saving his business and protecting the creditors and investors in his various ongoing development projects. (Id. at 16.) Citing Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010), Cork contends that the intent to hinder, delay, or defraud Gun Bo is not satisfied by Gun Bo's pursuit of an uncollected state court judgment which resulted in Gun Bo not getting paid. (Id.) According to Cork, the money transfers he made between 2008 and 2014 were done to maintain his ongoing development projects, save the jobs of his employees, and protect investors and lenders on his projects, not to hinder, delay or defraud, a creditor. (Id. at 17.)

Based on the cases Cork cites in his opening brief,[4] Cork maintains that where there is no evidence that the transferred assets were not reasonably used or were squandered, indicia of fraud are lacking. (Id. at 18.) Furthermore, Cork contends that allegations of fraudulent intent may be rebutted by evidence that the debtor transferred property to keep a business afloat. (Id.) Continuing, Cork states that all of his efforts to pay back creditors and lenders who had invested far more in the projects than Gun Bo are not the actions of an individual trying to hinder, delay, or defraud anyone. (Id. at 18-20 (alleging that the funds he transferred were used for business expenses, i.e. his retirement money, $4 million dollars located in his off-shore trust, $600,000 in refinanced home equity, and $2.3 million in

---

[4] See, e.g., In re Brown, 108 F.3d 1290, 1293 (10th Cir. 1997); In re Miller, 39 F.3d 301, 307 (11th Cir. 1994).

1   personal tax refunds transferred to Searchlight, all to provide continued funding for his

2   development projects, creditors, and investors).)

3       Regarding Tiburon, Cork acknowledges that it was formed in a manner to keep it

4   away from litigation; its sole task was to manage the projects, prevent interference, so that

5   it could protect the investments of the creditors and investors on the various projects. (Id. at

6   21.) Thus, according to Cork, Tiburon was formed to protect investors and creditors that were

7   relying upon Cork's ability to manage the development projects, not to hinder, delay, or

8   defraud Gun Bo. (Id.)

9       In summary, Cork argues that the Bankruptcy Judge erred in finding that Gun Bo

10  sustained its burden of proof regarding intent because the money transfers Cork made to

11  Searchlight and Tiburon were made so that Cork could extricate himself from the particular

12  difficulty of losing the ability to manage the hundreds of millions of dollars of real estate and

13  in so doing was enabled to promote the interest of all other creditors by continuing his

14  business. (Id. at 22.)

15      In response, Gun Bo contends that this Court's review of the Bankruptcy Judge's

16  finding regarding Cork's intent under § 727(a)(2) is to be evaluated based on a clearly

17  erroneous standard of review. (Doc. 20 at 22.) In support, Gun Bo cites First Beverly Bank

18  v. Adeeb (In Re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986), for its holding that under §

19  727(a)(2) whether a bankruptcy debtor transferred assets pre-petition with an intent to hinder,

20  delay or defraud, a creditor is a finding of fact that is reviewed for clear error. (Id.)

21  According to Gun Bo, in Adeeb, the Ninth Circuit held that under § 727(a)(2), discharge may

22  properly be denied to a debtor when the facts show the debtor admitting that he transferred

23  assets intending to put them out of the reach of one of his creditors. (Id. at 24, (citing Adeeb,

24  787 F.2d at 1343).) Continuing, since the Adeeb debtor had the intent penalized by the

25  statute, "any other motivation he may have had for the transfer" of assets did not matter, and

26  thus, discharge of the debtor's debts was denied. (Id.) Similarly here, Gun Bo argues that pre-

27  petition Cork transferred his tax refunds to Searchlight so that he could continue his business

28  operations without being bothered by Gun Bo or other pre-petition creditors and that this

transfer effectively placed the Searchlight Funds beyond the pre-petition creditors' reach, thus hindering, delaying, and defrauding them. (Doc. 20 at 25.)

As to Cork's argument that a debtor's fraudulent intent may be rebutted by evidence that the debtor transferred assets to keep a business afloat, Gun Bo contends that the Ninth Circuit in Adeeb has already rejected such an argument, and furthermore that the facts of the cases cited by Cork cut against such an argument. (Id. at 26.) As to Cork's cases, Gun Bo argues that in Miller, 39 F.3d at 307, the court held that transfers to *bona fide* creditors to keep a business alive while satisfying the largest bankruptcy creditor are distinguishable from those involving transfers to non-creditors and/or family members, and that these latter type of transfers merit closer scrutiny. In Brown, the court distinguished between transferring title and merely granting a security interest, stressing that "[t]here is little question that if an individual transfers title of an item but continues to exercise dominion over it, that fraud could be inferred." 108 F.3d at 1293. Thus, according to Gun Bo, Miller and Brown do not support the proposition that a debtor's intent may be rebutted by evidence that the debtor transferred assets to non-creditor corporations, such as Searchlight and Tiburon, in order to keep his businesses afloat financially.

In reply, Cork maintains that even though the Bankruptcy Judge did not believe the testimony he presented regarding the transfers, that disbelief did nothing to relieve Gun Bo of its obligation to present admissible evidence of actual intent to hinder, delay, or defraud bankruptcy creditors. (Doc. 17 at 10.) Regarding his testimony that he formed Tiburon as an entity "away from litigation" that could be used to manage the affairs of his business ventures, Cork disagrees that such was an admission of actual intent to hinder, delay, or defraud Gun Bo. (Id. at 11.) According to Cork, Tiburon was formed so that Cork could continue managing assets and making payroll and doing the things that must be done as a land banker. (Id. at 12.) Therefore, Cork maintains that Adeeb is not controlling because in Adeeb the debtor admitted actual intent; the Ninth Circuit neither resolved nor needed to resolve whether circumstantial evidence or inferences demonstrated the existence or absence of actual intent on the debtor's part. (Id.)

1       The Court finds that the Bankruptcy Judge's factual determinations are supported by

2  the record–Cork transferred assets pre-petition and post-petition with the intent to hinder,

3  delay, or defraud creditors and thus was properly denied discharge pursuant to 11 U.S.C. §

4  727(a)(2). Here, as in the Bankruptcy Court, Gun Bo, the party objecting to Cork's discharge

5  of a debt, retains "the burden of proving by a preponderance of the evidence that [the

6  debtor's] discharge should be denied." In re Khalil, 379 B.R. at 172. This Court reviews *de*

7  *novo* whether Gun Bo satisfied the requirements of 11 U.S.C. § 727(a)(2)(A) and (B), which

8  provides:

9      (a) The court shall grant the debtor a discharge, unless– . . . (2) the debtor, with
        intent to hinder, delay, or defraud a creditor . . . has transferred . . .

10         (A) property of the debtor, within one year before the date of the filing of the
           petition; or

11         (B) property of the estate, after the date of the filing of the petition . . . .

12  11 U.S.C. § 727(a)(2)(A),(B). Intent under § 727(a)(2) requires a finding of actual intent to

13  hinder, delay, or defraud creditors. See Devers v. Bank of Sheridan, Montana (In re Devers),

14  759 F.2d 751, 753 (9th Cir. 1986). Whether a debtor harbors "intent" to hinder, or to delay,

15  or to defraud a creditor is a question of fact that requires the trier of fact to delve into the

16  mind of the debtor and may be inferred from surrounding circumstances. Emmett Valley

17  Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir 1992) (stating that

18  certain "badges of fraud" may suggest that a transaction's purpose was to defraud creditors

19  but that not all of such factors need to be present, including: 1) a close relationship between

20  the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3)

21  that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all

22  or substantially all of the Debtor's property was transferred; 5) that the transfer so completely

23  depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any

24  part of the judgment; and 6) that the Debtor received inadequate consideration for the

25  transfer.); see also In re Retz, 606 F.3d at 1199 (stating that intent may be established by

26  circumstantial evidence, or by inferences drawn from a course of conduct).

27       On appeal, the Bankruptcy Judge's findings regarding intent under § 727(a)(2) is

28  reviewed by this Court for clear error. See Hughes v. Lawson (In re Lawson), 122 F.3d 1237,

1   1240 (9th Cir. 1997). A court's factual determination is clearly erroneous if it is illogical,

2   implausible, or without support in the record. See United States v. Hinkson, 585 F.3d 1247,

3   1261-62 (9th Cir. 2009) (en banc).

4       Two elements comprise an objection to discharge under § 727(a)(2): 1) a disposition

5   of property, such as a transfer or concealment, and 2) a subjective intent on the debtor's part

6   to hinder, delay, or to defraud a creditor through the act of disposing of the property. See In

7   re Lawson, 122 F.3d at 1240. Both elements must take place within the one-year pre-filing

8   period for § 727(a)(2)(A); and similarly both elements must take place after the debtor files

9   his bankruptcy petition for § 727(a)(2)(B). See id. Lack of injury to creditors is irrelevant

10  under § 727(a)(2). See Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281-82 (9th Cir.

11  1996).

12      § 727(a)(2)(A) and (B)

13      The Bankruptcy Judge thoroughly detailed the factual background in this matter. (ER

14  4-25.) Pursuant to § 727(a)(2)(A) and (B), the Bankruptcy Judge concluded that Cork

15  disposed of property belonging to him within one-year of his petition date, and also after

16  filing his bankruptcy petition, with the intention of hindering, delaying and defrauding

17  creditor(s). (ER 36.)

18      Regarding transfers, the Bankruptcy Judge found and concluded that Cork made pre

19  and post petition transfers. (ER 36.) Cork does not contest these § 727(a)(2) transfers. (Doc.

20  9 at 16; SER 326.)The Bankruptcy Code and Rules required Cork to file his schedules and

21  his statements of financial affairs ("SOFA") within 14 days after filing his bankruptcy

22  petition. See 11 U.S.C. § 521; Fed. R. Bankr. P. 1007. Cork was required to list all of his

23  assets and liabilities on his schedules and to disclose in his SOFA any transfers that he made

24  within two years of the bankruptcy filing and any property that is owned by another but

25  controlled by Cork. (SER 194-226.) Cork's schedules and SOFA were filed subject to

26  penalty of perjury. See 28 U.S.C. § 1746; Fed. R. Bankr. P. 1008; 18 U.S.C. § 152(1), (2).

27      Cork did not list transfers to Searchlight or Tiburon on his bankruptcy schedules.

28  (SER 194-226.) Cork admitted that he did not disclose that he had transferred nearly $2.3

1   million to Searchlight within a year of filing his Chapter 11 bankruptcy. (<u>See</u> SER 166-67;

2   233-36; <u>see generally</u> SER 227-45.) On his schedules, he did list a $500,000 "debt" that

3   Searchlight allegedly owed to him. (ER 8; SER 200.) Further, Cork admitted that when he

4   amended his SOFA about a month later he did not disclose the $2.3 million transfer that he

5   made to Searchlight. (SER 167.) Cork did not disclose the transfer on his SOFA until March,

6   2013, almost 16 months after filing for bankruptcy. (ER 22; SER 246-47.)

7       Post-petition, it was undisputed that Cork transferred funds from Searchlight to

8   Tiburon. At trial, Cork testified that he continued to direct money out of Searchlight's IBC

9   Account after he filed for bankruptcy, directing the transfer of funds from Searchlight to

10  Tiburon. Mr. Cork testified, as follows:

11          Q: Well, after the bankruptcy was filed, did you ask your children to send
            money to Tiburon?
12          A: Probably, yes, if that's where it went, yeah.
            Q: And would they agree and send the money to Tiburon when you asked?
13          A: Yes. I assume you've seen checks.

14  (ER 9-10.) The money drawn out of Searchlight by Cork included $1,042,000 paid to

15  Tiburon. (ER 13.) Following trial, in a closing argument memorandum, Cork acknowledged,

16  "[i]n this case, the fact of the transfers has not been disputed. The issue is intent." (SER 326.)

17      Regarding intent, the Bankruptcy Judge's findings regarding intent under § 727(a)(2)

18  is reviewed by this Court for clear error. While actual intent is required under § 727(a)(2),

19  a direct admission is not required, rather, such intent is established by circumstantial

20  evidence or by inferences drawn from a course of conduct. <u>In re Adeeb</u>, 787 F.2d at 1343.

21      The Bankruptcy Judge first detailed Cork's litigation conduct in state court wherein

22  Gun Bo was attempting to satisfy a seven million dollar state court judgment against Cork.

23  To the extent that Cork's state court actions were outside of the time period of § 727(a)(2),

24  the Bankruptcy Judge found that Cork's actions in state court constituted a continuing course

25  of conduct when combined with Cork's fraudulent acts performed within one year of filing.

26  <u>See Freelife Int'l LLC v. Butler (In re Butler)</u>, 377 B.R. 895, 917 (Bankr. D. Utah 2006)

27  (stating that evidence of intentional conduct which itself cannot form the basis for denial of

28  discharge nevertheless may be considered on the issue of intent because transactions that

1   occur outside of one year prior to bankruptcy help to solidify the presumption drawn from

2   the conduct at issue that did occur within one year of filing).

3          During state court litigation, between May 2009 and July 2009, the Bankruptcy Judge

4   found that Cork and his wife transferred $3.1 million to a Swiss bank account held by a Cook

5   Islands trust (the "Los Cabos Trust") controlled by Cork. (ER 17; SER 79.) The state court

6   found that the transfers were fraudulent and made "in order to secret funds from" Gun Bo.

7   (Id.) In May 2010, the state court ordered Cork to liquidate $3.1 million from the Los Cabos

8   Trust and pay the funds over to Gun Bo. (ER 18; SER 82-83.) In August 2010, the state court

9   ordered Cork to transfer all of the Los Cabos Trust's assets to Gun Bo. (ER 18-19; SER

10  86-87.) In November 2010, the state court concluded that Cork caused CW Capital to

11  fraudulently transfer real estate to a newly formed entity that he controlled. (ER 19-20; SER

12  91-93.) The state court enjoined further transfer of the property. (Id.) In December 2010 and

13  again in May 2011, the state court held Cork in contempt of court with regard to his actions

14  for failing to bring back funds held by the Los Cabos Trust and moving assets he controlled

15  in order to confound Gun Bo from collecting on its judgment. (ER 20-21; SER 99-102, 107.)

16         In support of its finding that Cork acted with intent to hinder, delay, or defraud his

17  creditors in connection with transfers subject to § 727(a)(2), the Bankruptcy Judge spent nine

18  pages thoroughly discussing and analyzing how Cork made these transfers with the intent to

19  hinder, delay and defraud his creditors all in violation of the statute. (ER 37-45.) This Court's

20  review for clear error determines whether the Bankruptcy Judge's findings were illogical,

21  implausible, or without support in the record. See Hinkson, 585 F.3d at 1261-62. The

22  Bankruptcy Judge's findings were not illogical, implausible, or without support in the record,

23  rather, such findings are sustained by the record. For instance, Cork admitted that he formed

24  Tiburon and placed it in the children's names because he wanted an entity free from litigation

25  by his creditors including Gun Bo. (SER 128-33.) Thus, Cork's transfers from Searchlight

26  to Tiburon are examples of post-petition transfers done with his stated intent to hinder, delay

27  or defraud his creditors.

28         Further, the Bankruptcy Judge discussed circumstantial evidence of Cork's intent to

hinder, delay or defraud, as follows:

> [Pre-petition][t]he Debtor transferred the Tax Refunds to Searchlight with the intent of ultimately transferring those funds to Tiburon or other entities controlled by him. He claims these funds were expended in his efforts to prop up entities for which the investors or creditors of those entities were willing to continue to work with the Debtor and the entities Debtor controlled. However, when asked how he or his creditors were benefitted by his transfers to Searchlight and Tiburon, Debtor could not answer the question.
>
> When he transferred the Tax Refunds to Searchlight, Debtor knew Plaintiff would not work with him, Searchlight, or Tiburon. Debtor also knew Plaintiff would not cooperate with him when he (or others, at his direction) transferred funds out of Searchlight. Debtor transferred the Tax Refunds to Searchlight with the intent to hinder, delay, and defraud Plaintiff in its efforts to collect its State Court Judgment against Debtor. This Court finds Debtor made such transfers with a subjective intent to hinder, delay, and defraud Plaintiff and other creditors of Debtor, and to deny Plaintiff and such other creditors access to any portion of Debtor's Tax Refunds.
>
> At all relevant times post-petition, the Debtor intended to spend all or substantially all of the funds in Searchlight's possession to or for the benefit of his family or himself or investors (other than the Plaintiff), and that Debtor caused Searchlight, Tiburon, and his children to effectuate that intent.
>
> Debtor's scheduling of a $500,000 loan by him to Searchlight was a farce. Debtor transferred the Tax Refunds to Searchlight with the intent that such cash remain Debtor's cash to be used as he pleased. Transferring the Tax Refunds to the Searchlight entity was the functional equivalent of transferring these funds to a bank account exclusively controlled by Debtor. Debtor alone decided how to spend those funds. His will was expressed to his children and his subordinates and they gave effect to Debtor's wishes. The Court finds Debtor intended that no portion of the Tax Refunds would ever be used to pay Plaintiff or to in any way benefit Plaintiff.
>
> Debtor's transfer of the Tax Refunds to Searchlight was a transfer of substantially all of the valuable assets he owned on that date. No records of Searchlight reflected its receipt of the Tax Refunds as a loan to it from Mr. Cork, nor do Searchlight's records reflect a paydown of a loan from when Searchlight transferred funds to Tiburon or to any other destination. This transfer was neither a loan nor intended as a loan, but rather as a means to keep this cash away from Plaintiff and to maintain control of the cash outside his soon-to-be-created bankruptcy estate. Debtor transferred these Tax Refunds to Searchlight, for no consideration, in the year prior to his bankruptcy filing, albeit to an entity he effectively and entirely controlled.
>
> Debtor admits he transferred assets out of his name so those assets (including the Tax Refunds) could be controlled free from litigation. The Court finds this is an admission that Debtor made these transfers with the intent to hinder and delay his creditors.

(ER 38-40.)

Finally, the Bankruptcy Judge reviewed and discussed all of the "badges of fraud" set forth by the Ninth Circuit in In re Ritz, by which to determine violations of § 727(a)(2), which are specifically:  1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was

1    insolvent or in poor financial condition at the time; 4) that all or substantially all of the

2    Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's

3    assets that the creditor has been hindered or delayed in recovering any part of the judgment;

4    and 6) that the Debtor received inadequate consideration for the transfer.

5         First, the Tax Refunds, the Los Cabos assets, the Westpark assets, and funds held by Searchlight and Tiburon were transferred to Debtor, his children

6    and entities dominated and controlled by Debtor. There were very close relationships between these transferors and transferees. Debtor controlled all

7    of them. While some of these transfers admittedly occurred outside the 727(a)(2)(A) one year look back period, this Court finds a consistent pattern

8    of deception, inside dealing and Debtor's intent to thwart rightful claims of his creditors.

9         Second, Debtor made the transfers in question before, during, and after his State Court Lawsuit with Gun Bo and at a time when many others were

10   suing or had sued debtor, Mrs. Cork, and Debtor's entities. Although Debtor claims to have (together with his legal and accounting advisors) established his

11   scheme before the State Court Lawsuit, the Court finds Debtor was well aware of the inevitability that creditors would be pursuing collection remedies against

12   his assets. The "anticipation of a pending suit" badge of fraud is clearly present. Moreover, even if Debtor was acting upon the advice of his lawyers

13   or other advisors (and Debtor did not persuade the Court he did), Debtor is saavy enough and intelligent enough to know the consequences of his actions.

14        Third, as noted [ER 37], the Debtor was, at all relevant times, insolvent. Massively so.

15        Fourth, when Debtor transferred the Tax Refunds to the Searchlight Account, he was transferring substantially all of his non-exempt assets. When

16   he transferred those funds out of Searchlight, he effectively moved substantially all his non-exempt net worth beyond the grasp of his creditors,

17   especially Gun Bo.
          Fifth, the transfers described above so depleted Debtor's assets that Gun

18   Bo and Debtor's bankruptcy estate were hindered and delayed in recovering their claims against Debtor.

19        Sixth, the only consideration Debtor received for the transfers and re-transfers of his assets was the cooperation of his pre-recession investors in

20   post-2008 transactions. Granted this was important to Debtor and was his main objective in making these transfers. However, as noted above, the fact that

21   Debtor feathered his post-recession nest by working cooperatively with these investors did not result in any meaningful payments of Debtor's pre-petition

22   claims to his creditors, including these investors.
          In summary, every badge of fraud identified in Retz is present in this

23   matter. The Court finds that, in the one year prior to the Petition Date and in the time after the filing of the Petition, the Debtor, with the subjective intent

24   to hinder, delay, or defraud his creditors, transferred, removed, or concealed, or has permitted others to transfer, remove, or conceal, the Debtor's property.

25   (ER 45-46.)

26        This Court has reviewed the elements at issue in § 727(a)(2). Cork does not dispute

27   the facts regarding his § 727(a)(2) transfers (SER 326), and the Court has already detailed

28

- 15 -

1  such transfers (supra at 11-12). Regarding intent, the Bankruptcy Judge's findings on Cork's

2  violation of § 727(a)(2) were not clearly erroneous. They were not illogical, implausible, or

3  without support in the record; rather, the Court concludes that the Bankruptcy Judge's

4  finding on intent to hinder, delay or defraud, is sustained by the record.

5         *Denial of Discharge under § 727(a)(4)(A).*

6         Cork contends that the Bankruptcy Judge erred in finding that his actions constituted

7  a "false oath" under § 727(a)(4). (Doc. 9 at 22.) Cork contends that the court first erred in

8  finding that several representations he made regarding the nature of the funds transferred to

9  Searchlight, and his interest and control of Searchlight and Tiburon, were "material false

10  oaths" under § 727(a)(4). (Id.)

11        Next, Cork contends that the court erred in finding that these alleged "false oaths"

12  caused substantial actual harm to his pre-petition creditors. (Id.) Cork maintains that none

13  of the statements relied upon by the Bankruptcy Judge had an impact on his bankruptcy, and

14  certainly did not cause "substantial harm" to the creditors. (Id. at 24.) Specifically, Cork does

15  not dispute that he transferred $2,261,551 to Searchlight. (Id.) However, because he settled

16  with the Bankruptcy Trustee for $1.3 million, and because approximately $1,029,000 worth

17  of funds from Searchlight and Tiburon were disbursed to the creditors named on Cork's

18  bankruptcy schedules, therefore more than $2.3 million dollars went to his bankruptcy

19  creditors, an amount more than the $2,261,551 which Cork transferred to Searchlight. (Id.)

20  Thus, any alleged false statement found by the Bankruptcy Judge regarding Searchlight funds

21  or control of Searchlight or Tiburon had no impact on the bankruptcy case and was not

22  grounds for denial of a discharge under § 727(a)(4)(A). (Id.)

23        According to Gun Bo, the Bankruptcy Judge found that: (1) Cork misrepresented in

24  his bankruptcy schedules that Searchlight owed him only $500,000 instead of the full amount

25  of the $2,261,551 he had transferred to Searchlight; (2) Cork omitted from his Statement of

26  Financial Affairs the required disclosure of his transfer of nearly $2.3 million to Searchlight;

27  (3) Cork falsely testified under oath at the initial meeting of creditors that $500,000 would

28  be paid by Searchlight to the bankruptcy estate within 7-10 days; (4) in objecting to the

Unsecured Creditors Committee's motion for an order to show cause why the $500,000 had not been turned over by Searchlight, Cork falsely claimed that he did not have complete control over Searchlight and that there was no urgency mandating the immediate turnover of the funds; (5) Cork falsely stated in his disclosure statement in support of his bankruptcy plan that the $500,000 of Searchlight Funds would be paid to his creditors under the plan; and (6) Cork falsely testified under oath at his creditors' meeting that he had nothing to do with Searchlight and that his children controlled Searchlight—testimony he admitted at trial was false. (Doc. 20 at 30-31.)

Gun Bo argues that these false statements were material. (Id. at 31.) On a number of occasions Cork's false statements misled the court and his creditors. (Id.) For example, while Cork testified on January 12, 2012, at his initial meeting of creditors that the $500,000 owed by Searchlight would be turned over to his bankruptcy estate within 7-10 days, on January 30, he was directing the transfer of $42,000 from Searchlight to Tiburon and $2,000 to his daughter Emilie; in early February, he directed another $27,500 to Tiburon; on February 13, another $27,500 to Tiburon; etc. (Id., (citing SER 162).) As a result of Cork's false statements and misdirection, instead of $500,000 being turned over, ultimately only $26,500 was given to the Trustee. (Doc. 20 at 31.)

As to Cork's no harm no foul argument, Gun Bo contends that Cork's analysis is false. Cork's catch-me-if-you-can conduct caused the unsecured creditors committee to incur $175,000 in investigative fees and costs (SER 292-93), and the Trustee to incur $600,000 in fees and costs (SER 295-96). (Doc. 20 at 34.) Gun Bo contends that these fees and costs will be paid from the $1.3 million that Cork agreed to pay the Trustee before unsecured creditors receive anything. (Id.) Gun Bo further contends that Cork wrongly equates the payment of "business expenses" by Searchlight and Tiburon as payments to pre-petition creditors. (Id.) According to Gun Bo, Cork conceded as much through counsel during his closing argument:

> So, nowhere in Mr. Cork's testimony do we say, "Oh, I'm paying my pre-petition creditors." His intent – his purpose throughout four-and-a-half years has been to maintain a very difficult and complicated business, one that requires significant cash flow to maintain. And he's been successful in doing that to the benefit of all of those investors who decided to stay in the game

1    with him and go into the projects that they've gone into.

2    (Id., (citing SER 55).)

3    In reply, Cork argues that with respect to its claim under Section 727(a)(4)(A), Gun

4    Bo had to prove not only that Cork made a false oath, but that Cork knew the oath was false

5    at the time it was made; and made it with the intention and purpose of deceiving creditors,

6    citing In re Retz, 606 F.3d at 1198-99. (Doc. 17 at 4.) Although acknowledging that intent

7    may be proven with circumstantial evidence, Cork maintains that Gun Bo had the affirmative

8    obligation to establish facts or circumstances that "point toward fraud" citing Garcia v.

9    Coombs (In re Coombs, 193 B.R. 557, 564 (Bankr. S.D. Cal. 1996). (Id.) Thus, Gun Bo had

10   to prove that Cork in making the transfers and sworn statements, he had the actual intent

11   necessary under § 727. (Id.) At trial, Cork states that he sought to make plain that his

12   intention in his transfers of funds to and from Searchlight, and his false statements, was to

13   preserve his business ventures, not to harm Gun Bo. (Id. at 5.)

14   Pursuant to 11 U.S.C. § 727(a)(4)(A), the Court will find that Cork knowingly and

15   fraudulently made a false oath or account and thus the Bankruptcy Judge properly denied

16   Cork's discharge pursuant to 11 U.S.C. § 727(a)(4)(A). Here, as in the Bankruptcy Court,

17   Gun Bo, the party objecting to Cork's discharge of a debt, retains "the burden of proving by

18   a preponderance of the evidence that [the debtor's] discharge should be denied." In re Khalil,

19   379 B.R. at 172. This Court reviews de novo whether Gun Bo satisfied the requirements of

20   11 U.S.C. § 727(a)(4)(A), which provides:

21   (a) The court shall grant the debtor a discharge, unless– . . . (4) the debtor
     knowingly and fraudulently, in or in connection with the case–
22   (A) made a false oath or account; . . .

23   11 U.S.C. § 727(a)(4)(A). "A false statement or an omission in the debtor's bankruptcy

24   schedules or statement of financial affairs can constitute a false oath." In re Khalil, 379 B.R.

25   at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors

26   have accurate information without having to conduct costly investigations." Id. (further

27   citation and quotation omitted). To prevail on a claim under § 727(a)(4), "a plaintiff must

28   show, by a preponderance of the evidence, that: (1) the debtor made a false oath in

1  connection with the case; (2) the oath related to a material fact; (3) the oath was made

2  knowingly; and (4) the oath was made fraudulently. A finding of fraudulent intent is a

3  finding of fact reviewed for clear error." In re Retz, 606 F.3d at 1197 (further citation and

4  quotation omitted).

5                       *False Oath*

6         A false oath may involve a false statement or omission in the debtor's bankruptcy

7  schedules or SOFA. See Searles v. Riley, Chap. 7 Trustee (In re Searles), 317 B.R. 368, 377

8  (BAP 9th Cir. 2004); Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58

9  (BAP 9th Cir. 1999). A false oath is complete when made. In re Searles, 317 B.R. at 377.

10 "Where the offending oath is contained in the schedules or required statements, the debtor's

11 continuing duty to assure the accuracy of such schedules and statements means that the

12 proper method of correction is a formal amendment of the schedules." Id.

13        The Bankruptcy Judge discussed and found numerous false oath errors and omissions

14 in Cork's bankruptcy schedules, his SOFAs, his testimony at the Chapter 11 first meeting of

15 creditors, his testimony at the Chapter 7 first meeting of creditors, his April 2, 2012,

16 disclosure statement, and his Objection to the Committee of Unsecured Creditor's Motion

17 for Order to Show Cause why Searchlight, LLC had not returned estate funds to the estate.

18 (ER 29-34.) Here, the Court only need discuss some of the more significant errors and

19 omissions made under oath.

20        Cork omitted to list his money transfers to Searchlight or Tiburon on his bankruptcy

21 schedules, which were made under oath, and should have included $2.2 million in tax refunds

22 to Searchlight. (SER 194-226.) Further, Cork's SOFA omitted the transfer of the $2.2 million

23 in tax refunds to Searchlight. (SER 166-67, 233-36.)  Cork admitted that when he amended

24 his SOFA about a month later he omitted to disclose the $2.2 million transfer that he made

25 to Searchlight. (SER 167.) Cork did not disclose the transfer on his SOFA until March, 2013,

26 almost 16 months after filing for bankruptcy. (SER 246-47.) Cork concedes in his Reply that

27 "there is no dispute that Cork transferred the Searchlight Funds, and thereafter made false

28 statements relating those funds . . ." (Doc. 17 at 4.) The Bankruptcy Judge found that both

1  Cork's schedules and his SOFAs were materially false. (ER 29-31.)

2  　　　Furthermore, Cork falsely stated on his bankruptcy schedules that Searchlight owed

3  him $500,000. (SER 200.) Searchlight did not owe Cork $500,000; rather, the money in the

4  Searchlight account belonged to Cork. (ER 29-30.) The Bankruptcy Judge found Cork's

5  bankruptcy schedules materially false. (Id.)

6  　　　Finally, at his Chapter 11 first meeting of creditors, Cork testified that the $500,000

7  "debt" listed on his schedules was an asset, then (after being coached by his attorney) he

8  revised his testimony stating that it was a debt, and also testified that it would be repaid

9  within 7 to 10 days. (ER 31-32; SER 263-64.) The Bankruptcy Judge found that the $500,000

10  was property of the estate that did not belong to Searchlight and that Cork never intended to

11  pay the $500,000 to the estate, "much less within 7-10 days" of the first meeting of creditors.

12  (ER 32.) Thus, the Bankruptcy Judge found Cork's Chapter 11 testimony materially false.

13  (Id.)

14  　　　This evidence is sufficient to support the Bankruptcy Judge's findings that Cork made

15  false oaths on his bankruptcy schedules, his SOFAs, and other sworn statements.

16  　　　　　　　*Materiality*

17  　　　 "Section 727(a)(4)(A) requires that the relevant false oath relate to a material fact.

18  A fact is material if it bears a relationship to the debtor's business transactions or estate, or

19  concerns the discovery of assets, business dealings, or the existence and disposition of the

20  debtor's property. An omission or misstatement that detrimentally affects administration of

21  the estate is material." In re Retz, 606 F.3d at 1198 (further citation and quotation omitted).

22  　　　The Bankruptcy Judge found that Cork's failure to list the $2.2 million dollar transfer

23  on his bankruptcy schedules and SOFAs was nothing other than a means of keeping the tax

24  refunds away from his creditors. (ER 29.) Cork did not disclose the $2.2 million dollar

25  transfer on his SOFA until March 2013, almost 16 months after filing for bankruptcy. (SER

26  246-47.) The Bankruptcy Judge found that Cork submitted materially false schedules and

27  SOFAs. (ER 30-31.) Moreover, the Bankruptcy Judge found that Cork's Chapter 11

28  testimony was materially false. (Id. at 32.) This evidence is sufficient to support the

Bankruptcy Judge's finding that Cork's failure to list the $2.2 million dollar transfer and Cork's Chapter 11 testimony were both materially false.

As to Cork's argument on appeal that such misstatements did not cause harm to his creditors because more than $2.2 million ultimately went to his creditors, the Court agrees with Gun Bo's analysis that $2.2 million ultimately <u>did not</u> go to his creditors. Cork's materially false statements caused the Chapter 11 unsecured creditor's committee to incur $175,000 in investigative fees and costs (SER 292-93), and the Trustee to incur $600,000 in fees and costs (SER 295-96). <u>See</u> <u>Khalil</u>, 379 B.R. at 172 (stating that a fundamental purpose of § 727(a)(4)(A) is to ensure that the trustee and creditors have accurate information without having to conduct costly investigations).

*Knowingly*

A debtor acts knowingly if he acts deliberately and consciously. <u>In re Khalil</u>, 379 B.R. at 173. As previously mentioned and found, Cork's failure to list the $2.2 million dollar transfer on his bankruptcy schedules and his SOFAs was nothing other than a means of keeping his tax refunds away from his creditors so that he could provide monies to his new investors in an attempt to preserve his business ventures. (ER 29.) Cork knowingly and fraudulently made these false statements under oath. Upon review of Cork's Chapter 11 first meeting testimony, Cork knowingly and fraudulently made false statements under oath regarding the alleged $500,000 asset in Searchlight with the intention that he deceive his creditors and the Court. This evidence is sufficient to support the Bankruptcy Judge's findings that Cork knowingly made false oaths on his bankruptcy schedules, his SOFA, and other sworn statements.

*Fraudulent Intent*

Plaintiff must demonstrate this element by showing Debtor made his false representations or omissions at a time when he knew them to be false and that he made them with the intention and purpose of deceiving his creditors. <u>In re Khalil</u>, 379 B.R. at 173. The intent required for finding that the debtor has acted fraudulently under § 727(a)(4)(A) with respect to a false oath must be actual intent: constructive fraudulent intent cannot be the basis

1    for the denial of a discharge. <u>In re Devers</u>, 759 F.2d at 753. Intent is usually proven by

2    circumstantial evidence or by inferences drawn from the debtor's conduct. <u>Id.</u> at 753-54. A

3    finding of fraudulent intent is a finding of fact made by the Bankruptcy Judge which this

4    Court reviews for clear error. <u>See</u> <u>In re Retz</u>, 606 F.3d at 1197

5        The Bankruptcy Judge found that Cork fraudulently made false statements under oath

6    regarding his bankruptcy schedules and his SOFAs, and further found that he fraudulently

7    gave false testimony to the Chapter 11 first meeting of creditors with an intent to deceive

8    both them and the Bankruptcy Court. Upon review, the Bankruptcy Judge's findings on

9    Cork's violations of § 727(a)(4)(A) were not clearly erroneous. The Bankruptcy Judge's

10    determination that Cork made false statements under oath with an intent to deceive is clear

11    from the record. Cork resolutely defied bankruptcy rules and procedures requiring truthful

12    disclosures of assets so that he could provide monies to his new investors in order to preserve

13    his business ventures. The Bankruptcy Judge's finding that Cork intended to deceive his

14    creditors and the Bankruptcy Court was not illogical, implausible, or without support in the

15    record; rather, the Court concludes that the Bankruptcy Judge's findings were well

16    established by the record.

17      *Res Judicata Bar*

18        Cork argues for the first time on appeal that Gun Bo's claims are barred by *res*

19    *judicata* because the Chapter 7 Trustee settled its adversary proceeding against him, which

20    was subsequently approved by the Bankruptcy Judge. (Doc. 9 at 20-24, <u>see</u> 2:13-ap-761).)

21    According to Cork, the Trustee's agreement to settle her adversary proceeding against him

22    also meant that the Trustee withdrew her objections to his § 727 discharge as part of that

23    settlement. (<u>Id.</u>)

24        Gun Bo contends that Cork waived such an argument because he never presented it

25    to the Bankruptcy Judge. Gun Bo states that Cork did not raise a *res judicata* argument at any

26    time either in his closing brief, his bench memorandum, the joint pretrial statement, or at

27

28

1   closing argument. (See SER 324-38, 313-23, 297-312, 1-74.)[5]

2        This Court normally declines to consider on appeal an argument that is not raised

3   below in the Bankruptcy Court. See, e.g., In re Mercury Interactive Corp. Sec. Litig., 618

4   F.3d 988, 992 (9th Cir. 2010) (stating the general rule against entertaining arguments on

5   appeal that were not presented or developed before the trial court, thus preserving a trial

6   court's opportunity to reconsider its rulings and correct its errors); Southern Cal. Permanente

7   Med. Group v. Ehrenberg (In re Moses), 215 B.R. 27, 35 n.11 (9th Cir. BAP 1997);

8   Consolidated Marketing Inc. v. Marvin Props. Inc. (In re Marvin Props., Inc.), 76 B.R. 150,

9   153 (9th Cir. BAP 1987); Credit Alliance v. Dunning–Ray Agency (In re Blumer), 66 B.R.

10  109, 111 (9th Cir. BAP 1986). Although this Court has discretion to consider issues not first

11  raised at trial, there is no obligation to do so. See In re Blumer, 66 B.R. at 111.

12       Cork's *res judicata* arguments were not presented in the Bankruptcy Court and this

13  Court considers them waived. The Bankruptcy Judge had no opportunity to consider and

14  make a ruling on this issue. This Court will not consider these arguments for the first time

15  on appeal.

16       Accordingly, on the basis of the foregoing,

17       **IT IS HEREBY ORDERED** affirming the Bankruptcy Court's final judgment

18  denying Cork's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), and

19  ///

20  ///

21  _____

22       [5]Gun Bo also responds on the merits arguing that *res judicata* does not apply because
23  the parties are not in privity, citing United States v. Bhatia, 545 F.3d 757, 759 (9th Cir.
    2008). (Doc. 20 at 36.) According to Gun Bo, a trustee or debtor-in-possession is not in
24  privity with a creditor when the trustee or debtor-in-possession does not have the right, or
    the exclusive right, to assert the claim on behalf of the creditor. (Doc. 20 at 36-37.) The
25  trustee's right to object to a debtor's discharge is not exclusive. (Id.) Under 11 U.S.C. §
    727(c)(1) "[t]he trustee, a creditor, or the United States trustee may object to the granting of
26  a discharge under subsection (a) of this section." (Id.) Gun Bo argues that privity does not
    exist because it, as a creditor, had already properly brought a nondischargeability adversary
27  proceeding against Cork. Thus, the Trustee's settlement had no effect upon Gun Bo's
28  nondischargeability adversary proceeding. (Id.)

1  727(a)(4)(A). (Doc. 1.)

2      DATED this 31st day of January, 2017.

3

4

5                              Stephen M. McNamee
6                        Senior United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28